IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRIAN W.,[1]                          )
                                      )
           Plaintiff,                 )
                                      )
vs.                                   )      Case No. 3:25-CV-460-MAB[2]
                                      )
COMMISSIONER OF SOCIAL                )
SECURITY,                             )
                                      )
           Defendant.                 )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Brian W. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying his application for a period of disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act. For the reasons set forth below, the Commissioner's decision is REVERSED and this matter is REMANDED for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Plaintiff applied for DIB in December 2021, alleging disability beginning on September 1, 2021 (Tr. 166-172). Plaintiff's DIB application was initially denied in October 2022 (Tr. 92-96), and upon reconsideration in June 2023 (Tr. 103-106). Thereafter, a hearing

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c) (Doc. 12).

was held before Administrative Law Judge Jason Yoder on November 28, 2023 (Tr. 34-72). Following the hearing, ALJ Yoder issued an unfavorable decision on December 28, 2023 (Tr. 12-29). Plaintiff timely filed a request for review, but that request was denied by the Appeals Council (Tr. 1-4). Accordingly, the ALJ's decision became the final agency decision and Plaintiff exhausted his administrative remedies (Tr. 1).

Plaintiff filed his Complaint with this Court on March 31, 2025 (Doc. 1). Thereafter, the Commissioner submitted a Transcript of the Administrative Record on April 24, 2025 (Doc. 13). Plaintiff's Brief was filed on June 25, 2025 (Doc. 17), and the Commissioner's Brief was filed on August 21, 2025 (Doc. 21). Plaintiff did not file a reply brief.

### APPLICABLE LEGAL STANDARDS

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes and regulations. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis. 20 C.F.R. § 404.1520(a). The first step is to determine whether the claimant is presently engaged in substantial gainful activity. *Id.* at § 404.1520(a)(4)(i). If the answer is yes, then the claimant is not disabled regardless of their medical condition, age, education, and work experience. *Id.* at § 404.1520(a)(4)(i), (b). If the answer is no and

the individual is not engaged in substantial gainful activity, the analysis proceeds to the second step. *Id.* at § 404.1250(a)(4).

At step two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii), 404.1509. If the answer is no, then the claimant is not disabled. *Id.* at § 404.1520(c). If the answer is yes, the analysis proceeds to step three. *Id.* at § 404.1520(a)(4).

At step three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 404.1520(d).

For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 404.1520(e). "In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record and provide a 'narrative discussion' that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and '[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.'" *Passig v. Colvin*, 224 F. Supp. 3d 672, 680 (S.D. Ill. 2016) (quoting SSR 96-8).

At step four, the ALJ must determine whether the claimant retains the RFC to continue performing their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer

is yes, then the claimant is not disabled. *Id.* at § 404.1520(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the final step. *Id.* at § 404.1520(a)(4).

At the fifth and final step, the ALJ must consider whether the claimant can make an adjustment to perform any other work. *Id.* at § 404.1520(a)(4)(v). If the claimant can make an adjustment to other work, then the claimant is not disabled. *Id.* at § 404.1520(g). Conversely, if the claimant cannot, then the claimant is disabled. *Id.*

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Thus, this Court's task is not to determine whether Plaintiff was, in fact, disabled at the relevant time, but instead to determine whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that

because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Id.* (internal citations omitted).

### THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record focuses on the specific medical records and opinions that are the subject of Plaintiff's challenges on appeal (*see* Doc. 17).

I.      *Selected Medical Records and Opinions:*

Medical records demonstrate that Plaintiff suffered from knee pain for an extended period of time (Tr. 551). X-rays in 2017 demonstrated a valgus deformity of the right knee with loss of lateral joint space, and a medial compartment disease with joint space narrowing in the left knee (Tr. 552). Plaintiff received a left knee injection around that time in 2017 (Tr. 554). At a July 2020 office visit, a physical examination found that Plaintiff was ambulating independently with an antalgic gait in moderate complaints of left knee pain (Tr. 565). A diagnostic impression stated that Plaintiff had "moderate degenerative arthritis of bilateral knees, left greater than right" and there was "interval progression from his 2017 films." (Tr. 565). During that appointment, the doctor also discussed concerns related to Plaintiff's obesity and how it would impact his impairments, as well as increase the risk factors associated with any surgery (Tr. 566). Additional injections in Plaintiff's left knee occurred in August 2020 (Tr. 569-574). X-rays of Plaintiff's knees in August 2023 demonstrated moderate lateral joint space narrowing and mild degenerative changes of the patellofemoral joint in Plaintiff's left knee and mild

degenerative patellofemoral joint changes with joint space narrowing and small spur formation in the right knee (Tr. 518-520).

Plaintiff also has a history of shoulder and back impairments and pain (*see, e.g.*, Tr. 325, 440). Moreover, he has been diagnosed with hypertension (Tr. 289) and depression (Tr. 356). Additionally, medical records show that Plaintiff is morbidly obese, weighing in excess of 500 pounds and having a BMI exceeding 60% (*see, e.g.* Tr. 294, 355, 359). Plaintiff did, however, undergo bariatric surgery around 2012 wherein he lost a substantial amount of weight (Tr. 289, 325, 551). But, he subsequently gained that weight back (Tr. 325).

There are several medical opinions in the record. State agency reviewing medical consultants, Dr. Chapa and Dr. Reddy, prepared reports based upon a review of Plaintiff's medical records wherein they found Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of 2 hours per workday, and sit for a total of "about 6 hours in an 8 hour workday." (Tr. 76, 87-88). Additionally, they found Plaintiff should be limited to occasional climbing ramps/stairs, occasional climbing ladders/ropes/scaffolds, occasional kneeling, occasional crouching, occasional crawling and occasional overhead reaching (Tr. 77, 88).

Dr. Feinerman prepared an opinion after examining Plaintiff at his office in August 2022 (Tr. 325). Dr. Feinerman reported that Plaintiff weighed 534 pounds at that time, although his office scale only went to 500 pounds, so he utilized the last weight recording from Plaintiff's doctor's office (Tr. 329). Dr. Feinerman found that Plaintiff can ambulate without an assistive device and is able to walk 50 feet (Tr. 330). He observed Plaintiff had

mild difficulty in getting on/off exam table, tandem walking, standing on toes, standing on heels, and arising from a chair (Tr. 330). Additionally, Plaintiff had moderate difficulty in squatting and arising (Tr. 330). Dr. Feinerman also determined that Plaintiff had normal muscle strength and normal fine and gross manipulation, including opposition of the fingers and thumb (Tr. 330). Dr. Feinerman then diagnosed Plaintiff with morbid obesity, degenerative disc disease, degenerative joint disease, and hypertension (Tr. 331). Dr. Feinerman concluded that Plaintiff "is able to sit, stand, walk, hear, speak, lift, carry, handle objects and handle funds on his own behalf." (Tr. 331). Dr. Feinerman did not, however, expand upon that statement by either opining as to how long Plaintiff could sit or stand in a workday, or by otherwise providing functional limitations on Plaintiff's abilities to perform those activities (e.g., estimating how much weight Plaintiff could lift or carry) (Tr. 331).

Occupational Therapist Brandi Kirby met with Plaintiff for a one time visit in October 2023 and then prepared a physical residual functional capacity assessment and a treating source statement (Tr. 538-548). Plaintiff's visit with Ms. Kirby lasted approximately 90 minutes, 80 minutes of which he spent sitting and the remaining 10 minutes he spent standing (Tr. 547). Ms. Kirby opined that Plaintiff was unable to lift 10 pounds or less from the floor to his waist, unable to shoulder lift 10 pounds or less, and unable to powerlift or bilaterally carry 10 pounds or less (Tr. 542, 547). She further determined that Plaintiff was unable to stand for 1 hour and 45 minutes, unable to sit for approximately 6 hours out of an 8 hour workday, and unable to sit for 2 hours at a time (Tr. 543). Instead, she opined that Plaintiff could spend a total of 2 hours and 8 minutes

sitting, with a maximum of 30 minutes sitting at a time, and a total of 34 minutes standing, with a maximum of 5 minutes standing at a time (Tr. 544). She further limited Plaintiff to occasional gross coordination, fine coordination, firm grasping, and pinching (Tr. 544). Likewise, she found Plaintiff should avoid bending, squatting, kneeling, off of ground static balance, off the ground dynamic balance, crawling, and using stairs and ladders (Tr. 546-547). In her treating source statement, Ms. Kirby specified that Plaintiff should never work with unprotected heights, moving mechanical parts, humidity and wetness, dust/odors/fumes/pulmonary irritants, extreme cold or heat, and vibrations (Tr. 540). Furthermore, in that source statement, Ms. Kirby opined that Plaintiff could sit for less than 1 hour in an 8 hour workday and stand/walk for less than 1 hour in an 8 hour workday (Tr. 539). Instead, she noted that Plaintiff would need to recline or lie down for at least 7 hours in an 8 hour workday (Tr. 539).

II.    *The Administrative Hearing*:

An administrative hearing before ALJ Yoder was held virtually on November 28, 2023 (Tr. 34-72). Plaintiff and his Attorney Bradley Sherrill appeared (Tr. 34). Vocational Expert ("VE") Ray Burger also provided testimony at the hearing (Tr. 65-72).

Plaintiff testified that he previously worked as a heavy equipment mechanic for almost five years until he was laid off at the end of 2019 (Tr. 40-41, 45). Prior to holding that position, Plaintiff operated his own lawn care company and worked brief stints at various other positions (Tr. 41-43). Subsequently, in 2021, Plaintiff realized he needed to claim disability when he attempted to cut down a tree for his friend but could not do so without first receiving assistance in starting his chainsaw because he couldn't breathe (Tr.

45). Plaintiff stated that he is 6 feet and 4 inches tall, and weighed 510 pounds at the time of the hearing (Tr. 45).

Plaintiff believed that the main things preventing him from working were issues with his lower back and knees (Tr. 46-47). He noted that his back pain was often severe, but varied from time to time (Tr. 47). However, activities such as standing, bending, or lifting anything exacerbated his pain (Tr. 47). The pain would also radiate down both legs, causing his legs to go numb (Tr. 47). Plaintiff testified that, on a daily basis, his pain was often 7 or 8 out of 10, but at its worst it could be a 10 plus (Tr. 47-48). Plaintiff had received chiropractic treatment for his back, but it was ineffective (Tr. 48). Additionally, he had previously been prescribed pain killers, but he could not stand the way they made him feel (Tr. 48). Plaintiff then explained that he never had surgery for his back, and no doctor had recommended such (Tr. 48).

Regarding his knees, Plaintiff said that both of his knees were problematic, but he had only ever had injections in his left knee (Tr. 48-49). However, Plaintiff and his doctors believed his right knee was worse than his left knee (Tr. 49). When asked how Plaintiff's knee problems limit him, Plaintiff answered that they cause him a great deal of pain and he occasionally uses a cane out of fear that they will give way (Tr. 49-50). Plaintiff then stated that his pain caused him to have trouble sleeping (Tr. 50). Plaintiff testified that he couldn't bend over to pick something up off the floor due to his pain and he also mentioned that his hands further limited him because they would cramp up or shake due to what was most likely carpal tunnel (Tr. 50). However, Plaintiff had not returned to an orthopedic doctor in several years because he no longer had insurance (Tr. 51-52).

Plaintiff then testified to issues he experienced in his shoulders due to what was most likely torn rotator cuffs (Tr. 52). He explained that any sort of reaching or grabbing away from his body hurts, and he suffered excruciating pain whenever he tried to raise his arms above his head (Tr. 52). Plaintiff was questioned about his issues with shortness of breath (Tr. 53). He responded that he had seen a doctor for it while he was still working his past job as a heavy equipment mechanic, but the doctors could not find a reason for the issue (Tr. 53). Plaintiff detailed how activities such as walking and bending over a little could cause him to experience shortness of breath.

Plaintiff was also asked about his depression, to which he said he felt sad all the time and thought he had let his family down (Tr. 54). Plaintiff next noted how his legs would cramp up if he sat for long periods of time (Tr. 54). Plaintiff's counsel then asked him to describe a typical day, to which Plaintiff answered that he primarily prepared simple meals in the morning and for lunch and would watch television (Tr. 54). However, he would have to occasionally get up to keep his legs from cramping (Tr. 54). His wife generally cooked dinner unless it was something he could throw in the microwave (Tr. 54). Plaintiff also stated that his back, knee, and shoulder pain would keep him from sleeping three to four times per week (Tr. 54-55).

Plaintiff testified that he did not do any household chores, and his mom mowed their yard (Tr. 55-56). Yet, he would aid in grocery shopping by placing online orders (Tr. 56). He also used Facebook and friends would occasionally come to their house (Tr. 56). When asked about hobbies, Plaintiff said he used to have hobbies including shooting, attending car and gun shows, and woodworking (Tr. 56). However, he had not done any

of those activities in the last two years (Tr. 56). Finally, Plaintiff stated that the main reasons he could not work were extreme pain and the risk of falling (Tr. 57).

The ALJ then asked Plaintiff if he was able to manage his own money, to which Plaintiff said he could (Tr. 62). Regarding personal care, Plaintiff stated that he experienced pain while doing activities like bathing or showering and dressing himself, but he could do them (Tr. 62). Plaintiff also testified to taking meloxicam and several over the counter pain medications such as ibuprofen, Tylenol, and Aleve (Tr. 63-64). He explained that he could drive and occasionally drove to go pick up online grocery orders (Tr. 64).

VE Ray Burger then appeared and first testified to Plaintiff's past work (Tr. 66-67). Specifically, VE Burger testified that Plaintiff's past work was classified as a heavy equipment mechanic, boiler maker, and lawn care worker (Tr. 67). The ALJ then posed the following hypothetical to the VE:

> For hypothetical #1, I would like you to please assume a hypothetical individual of the Claimant's age, education and past work experience who would be limited to a sedentary exertional range of work activity, which is going to be defined as lifting and carrying ten pounds occasionally and less than ten pounds frequently, sitting for at least six of eight hours, standing and walking for only about two out of eight hours. The individual could only occasionally use the bilateral lower extremities for pushing or pulling. The individual should never climb ladders, ropes or let's just say, I'm going to say never perform any climbing, kneeling, crouching or crawling. So never kneeling, climbing, crouching or crawling. The individual could occasionally perform stooping and balancing. The individual would need to avoid even moderate exposure to dangerous workplace hazards such as exposed moving machinery, unprotected heights and uneven terrain, temperature extremes of heat and cold, humidity as well as fumes, dust, odors, gases and areas of poor ventilation. And I'm going to stop there for the first hypothetical.

(Tr. 67). Given those limitations, the VE found that no past work could be performed (Tr.
67-68).

The ALJ then asked if, given that hypothetical, there would be any unskilled
occupations in the national economy that individual could perform (Tr. 68). The VE
answered, "[w]ithin that hypothetical, there'd be work as an addressing clerk, 209.587-
010, sedentary, SVP of 2, in the nation 3,000; a document preparer, 249.587-018, sedentary,
SVP of 2, 17,000; and another category would be an office clerk, 205.367 030, sedentary,
SVP of 2, 6,000." (Tr. 68). In response to a second hypothetical, the VE said that his
previous answer would not change if the hypothetical individual was limited to frequent
bilateral upper extremity overhead reaching (Tr. 68).

> The ALJ then posed the following third hypothetical:
>
> Hypothetical 3, if I change the overhead reaching to only occasional
> bilaterally and I also added that the individual should not perform any
> stooping as part of any job-related duties under so, never climbing,
> kneeling, stooping, crouching or crawling, could still balance occasionally,
> but should not perform any of those other postural activities, would that
> affect any of those jobs identified in hypothetical -- that you identified in
> hypotheticals 1 and 2?

(Tr. 68). In response, the VE said the new hypothetical would not alter his prior answer
(Tr. 68-69). The ALJ then posed a fourth hypothetical wherein the individual was limited
to sitting 1 hour per workday and standing/walking 1 hour per 8 hour workday, with
the individual being allowed to recline or lie down for the remaining time (Tr. 69). The
VE answered that the previously identified jobs could not be performed and there would
be no other work available under that hypothetical (Tr. 69). Likewise, when returning to

the first hypothetical but modifying it to allow the individual to be absent two or more days per month, the VE testified that no work would be available (Tr. 69).

The ALJ then asked the VE to explain how Plaintiff could perform the work of addressing clerk under the hypothetical that limited Plaintiff to occasional overhead reaching, when the Dictionary of Occupation Titles (DOT) indicated that position required frequent reaching (Tr. 70). The VE responded, "[d]ue to the fact of observation of the job, it's – it doesn't require overhead reaching." (Tr. 70). Instead, it required primarily front or lateral reaching (Tr. 70). Additionally, the ALJ asked the VE how several of the jobs he identified, such as document preparer and addressing clerk, had changed over time since they were last updated in the DOT (Tr. 70). The VE answered, "[t]he addresser has more to do with labels just being put onto envelopes or files and the document preparer has more to do with filling files in from Xeroxing copies and not dealing as much with microfiche." (Tr. 70). Finally, Plaintiff's counsel asked the VE if his answers would change if the earlier hypotheticals were modified to allow only occasional use of the bilateral upper extremities for reaching, handling, fingering, and feeling (Tr. 71). The VE answered that under counsel's modified hypothetical, no work would exist (Tr. 71).

<u>**THE ALJ'S DECISION**</u>

The ALJ's decision followed the five-step analytical framework described above (*see* Tr. 12-29). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 1, 2021 (Tr. 17). At step two, the ALJ found Plaintiff had the following severe impairments: bilateral knee degenerative joint

disease/osteoarthritis; class III obesity; degenerative disc disease; hypertension; mild left shoulder glenohumeral and AC degenerative joint disease; mild bilateral hip and SI joint degenerative joint disease (Tr. 17). The ALJ also determined that Plaintiff provided medical evidence to establish valid diagnoses for mixed hyperlipidemia, and vitamin D and vitamin B-12 deficiency (Tr. 18). However, those diagnoses had no more than minimal effects on Plaintiff's ability to perform basic work activities so they were considered non-severe (Tr. 18). "Nevertheless, in determining the claimant's residual functional capacity, the undersigned has considered any limiting effects of claimant's non-severe impairments in combination with their severe impairments." (Tr. 18). Additionally, the ALJ found Plaintiff had the medically determinable impairments of persistent depressive disorder with anxious distress (Tr. 18). However, the ALJ then went through the areas of mental functioning laid out 20 CFR Part 404, Subpart P, Appendix 1, and found that Plaintiff's medically determinable mental impairments did not cause more than mild limitations in any functional area, so they were non-severe (Tr. 19-20). Lastly, the ALJ found that Plaintiff's claim of having carpal tunnel syndrome was not a medically determinable impairment because there was no treatment or diagnosis of that impairment by an acceptable medical source during the relevant period (Tr. 20).

At step three, the ALJ held that Plaintiff's impairments, considered individually or in combination, did not meet or medically equal the criteria of any impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 20-22). Specifically, the ALJ found that Listings 1.15, 1.16, 1.18, and 4.02 all had not been met because there was insufficient documentation to establish every requirement of each respective listing (Tr. 21-22).

However, the ALJ noted that he considered Plaintiff's obesity when determining that Plaintiff did not meet or medically equal a listed impairment and in formulating Plaintiff's RFC (Tr. 22).

> Before reaching step four, the ALJ formulated Plaintiff's RFC, finding:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). He can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, sit for at least 6 out of 8 hours and stand and/or walk for about 2 out of 8 hours. He can occasionally push/pull with his bilateral lower extremities. He should never climb, kneel, stoop, crouch, or crawl. He can occasionally balance. He can occasionally reach overhead with the bilateral upper extremities. He needs to avoid even moderate exposure to dangerous workplace hazards such as exposed moving machinery, unprotected heights, and uneven terrain, temperature extremes of heat and cold, humidity and fumes, dusts, odors, gases, and areas or poor ventilation.

(Tr. 22-23).

In reaching this determination, the ALJ first noted that Plaintiff's initial application alleged back pain, bilateral knee pain, bilateral shoulder problems, arthritis, carpal tunnel, breathing problems, and morbid obesity as conditions that prevented him from working full time (Tr. 23). The ALJ then discussed evidence of Plaintiff's daily activities which included his ability to drive, go out alone, shop (in stores, by computer), manage money, and play videogames (Tr. 23). The ALJ also summarized Plaintiff's hearing testimony (Tr. 24). Thereafter, he stated, "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms

are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 24).

The ALJ recounted Plaintiff's orthopedic treatment records, noting that Plaintiff stated he often had to sit to control symptoms and imaging revealed moderate degenerative arthritis of the bilateral knees with left being worse than right (Tr. 24). The ALJ then emphasized gaps in Plaintiff receiving medication refills and Plaintiff's failure to take blood pressure medication (Tr. 24-25). The ALJ also noted that Plaintiff presented at a follow-up visit in March 2022 with pain and hand issues impacting his ability to complete daily activities, worsening left knee pain, and lower back pain (Tr. 25). At a consultative examination in August 2022, Plaintiff displayed mild difficulty getting on and off the examination table, tandem walking, standing on toes and heels, and arising from a chair (Tr. 25). However, ambulation was reported as normal without an assistive device, grip strength was strong and equal, muscle strength was normal, sensation was intact, and fine and gross manipulation were normal (Tr. 25). The ALJ further detailed how follow-up visits remained unremarkable and Plaintiff's symptoms remained stable (Tr. 25). The ALJ also noted that updated imaging in August 2023 noted mild to moderate degenerative changes of the left knee and mild changes of the right knee (Tr. 25). At an October 2023 follow-up, Plaintiff's examination was normal and treatment remained stable although he "complained of tremors in his bilateral hands that had been going on for multiple years although he never mentioned it in the past." (Tr. 25-26).

The ALJ observed that Plaintiff had been diagnosed with obesity and a body mass index ranging from 60 to 64 (Tr. 26). "The undersigned recognizes that the claimant's

obesity likely exacerbates his pain levels and hampers his ability to move. However, the objective evidence of record fails to show that the claimant's obesity affects his musculoskeletal, respiratory, or cardiovascular functioning to an extent that would warrant imposing limitations greater than those outlined in the determined residual functional capacity." (Tr. 26).

Turning to the opinion evidence, the ALJ found the opinions of non-examining state agency reviewing consultants Dr. Reddy and Dr. Chapa to be partially persuasive (Tr. 26). Specifically, he found the overall record supported imposing greater overall restrictions than those found by the state agency consultants (Tr. 26). Additionally, the ALJ reasoned that limiting Plaintiff to standing/walking for 2 hours per day was more consistent with sedentary work, as opposed to light work (Tr. 26). Moreover, while Plaintiff's consultative examination with Dr. Feinerman noted decreased range of motion in multiple joints, Plaintiff ambulated without an assistive device and had normal motor strength throughout his extremities, fine fingering ability, and normal gross grip (Tr. 26). The ALJ then discussed and found Dr. Feinerman's opinion to be only partially persuasive because it did not detail actual function by function abilities, failed to opine as to how long Plaintiff can sit and stand in a workday, and failed to opine as to how much weight Plaintiff could lift and carry (Tr. 26). "However, the claimant's examination is generally supportive of the above residual functional capacity." (Tr. 26).

The ALJ then considered the treating source statement and physical residual functional capacity assessments of occupational therapist, Ms. Brandi Kirby (Tr. 26) (citing Tr. 531-549). Significantly, the ALJ found Ms. Kirby's opinions were not persuasive

because they were both internally inconsistent and inconsistent with the overall record (Tr. 26). For instance, the ALJ took specific issue with the fact that "the functional capacity examination lasted 1.5 hours, with the claimant sitting for 1 hour and 20 minutes during the examination, yet the examiner concluded that out of an 8-hour day, the claimant would be limited to sitting only 2 hours and 8 minutes total, which seems very limiting considering he sat nearly 75% of the total time in the examination itself." (Tr. 26). Furthermore, the ALJ emphasized that when completing a medical source statement, Ms. Kirby found that Plaintiff could only sit for less than 1 out of 8 hours in a workday, in clear contradiction of her prior findings, "as well as the state agency reviewing consultants who are actual medical doctors." (Tr. 27).

The ALJ also considered the opinions related to Plaintiff's mental impairments and generally found them to be persuasive or at least partially persuasive (Tr. 27). The ALJ then assessed the statements of Plaintiff's wife, but generally found them to lack value because they were cumulative of Plaintiff's statements and by extension, not entirely consistent with the overall record (Tr. 27).

At step four, the ALJ relied upon the VE's testimony to determine that Plaintiff could not perform any past work as actually or generally performed (Tr. 27-28). Finally, at step five, the ALJ again relied on the VE's testimony to determine that even with his specific RFC, he could perform the requirements of representative occupations such as:

1. Addressing Clerk (DOT #209.587-010), sedentary exertion and unskilled with an SVP of 2 and 3000 jobs in the national economy;
2. Document Preparer (DOT #249.587-018), sedentary exertion and unskilled with an SVP of 2 and 17,000 jobs in the national economy;

3. Office Clerk (DOT #205.367-030), sedentary exertion and unskilled with an SVP of 2 and 6000 jobs in the national economy; and

4. Charge Account Clerk (DOT #205.367-014), sedentary exertion and unskilled with an SVP of 2 and 2000 jobs in the national economy.

(Tr. 28-29). The ALJ then explained how, per the VE's testimony, the addresser and document preparer positions had evolved over the years (Tr. 29). He also noted that the VE's testimony differentiating between overhead reaching and reaching in other directions was not discussed in the DOT and was instead based on the VE's many years of education, training, and experience (Tr. 29). Therefore, "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework of the above-cited rule." (Tr. 29).

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues in his brief (*see* Doc. 17 at p. 1):

A.   The ALJ did not properly evaluate the results of a functional capacity evaluation (FCE), as the ALJ failed to address portions of the result which were favorable to the claim.

B.   The ALJ did not properly evaluate Plaintiff's alleged limitations in sitting.

C.   The ALJ did not properly evaluate Plaintiff's symptoms under SSR 16-3p.

## DISCUSSION

Plaintiff first argues the ALJ did not properly evaluate Ms. Kirby's functional capacity evaluation (FCE) of Plaintiff (Doc. 17 at pp. 2-7). Crucially, in challenging the

ALJ's evaluation of Ms. Kirby's FCE, Plaintiff also challenges the ALJ's determination that a significant number of jobs exist in the national economy that he is able to work with his given RFC (*Id.* at pp. 4-5). Ultimately, because the step five issue of determining whether a significant number of jobs exist in the national economy is dispositive, the Court's analysis will focus upon that aspect of Plaintiff's challenge.

Pertinently, while the "claimant has the burden to prove steps one through four of the analysis, … the burden shifts to the Commissioner at step five." *Milhem v. Kijakazi*, 52 F.4th 688, 691 (7th Cir. 2022). Consequently, at step five, "[t]he Commissioner is 'responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy.'" *Id.* at 694 (quoting 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2)). "In determining whether there is a 'significant' number of jobs in the national economy, the regulatory scheme gives the ALJ discretion to decide, using substantial evidence, when a number of jobs qualifies as significant. Substantial evidence means 'evidence a reasonable person would accept as adequate to support the decision.'" *Id.* at 696 (quoting *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012)).

Here, the ALJ attempted to satisfy the Commissioner's step five burden by finding that Plaintiff could make an adjustment to other work that exists in significant numbers in the national economy because Plaintiff could perform at least four positions that total 28,000 jobs in the national economy (Tr. 28-29). As an initial note, that specific number of jobs falls on the lower end of the relatively-unclear range wherein courts within the Seventh Circuit have varied substantially as to what constitutes a significant number of

jobs in the national economy.[3] *See John C. v. Saul*, 2021 WL 794780, at *5 (C.D. Ill. Mar. 2, 2021) ("The Seventh Circuit has not affirmatively established the threshold for the number of jobs in the national economy that qualifies as significant."). However, the Court need not analyze the sufficiency of that 28,000 job figure because at least one of the DOT jobs contributing to that figure was erroneously cited by the VE and relied upon by the ALJ.

Specifically, the ALJ relied on the VE's testimony that Plaintiff could work as an "office clerk," DOT No. 205.367-030, which has 6,000 jobs in the national economy (Tr. 29). However, as Plaintiff correctly points out, the DOT code provided by the VE and relied upon by the ALJ is actually for the position of "election clerk." (*see* Doc. 17 at p. 5). While relying on either the wrong job code or wrong job is problematic in itself, this problem is exacerbated when dealing with the position of an election clerk because, "[o]bviously that is occasional rather than full-time employment, because elections are

---

[3] *Compare James A. v. Saul*, 471 F. Supp. 3d 856, 860 (N.D. Ind. 2020) ("The Court concludes that, as a matter of law, 14,500 jobs, or approximately 1 out of every 10,000 jobs, in the national economy is not a significant number of jobs."); *Sally S. v. Berryhill*, 2:18CV460, 2019 WL 3335033, at *11 (N.D. Ind. July 23, 2019) ("It has been the Commissioner's choice to focus on national numbers rather than local numbers and there is no authority stating that 120,350 jobs in the entire United States constitutes a significant number."); *Gass v. Kijakazi*, 1:19-CV-404-TLS, 2021 WL 5446734, at *8 (N.D. Ind. Nov. 22, 2021) ("District courts in this circuit have come to different conclusions as to how many jobs in the national economy is a significant number, but several have found that a number of jobs close to 24,000 was not a significant number in the national economy."); *with Milhem*, 52 F.4th at 696 (Finding "a reasonable person would accept 89,000 jobs in the national economy as being a significant number."); *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (Finding 140,000 positions available nationally to be "well above the threshold for significance."); *Todd E. v. Bisignano*, 3:25-CV-50008, 2026 WL 323505, at *3 (N.D. Ill. Feb. 6, 2026) (determining that a bagger position totaling 75,000 jobs was a significant number of jobs in the national economy); *Dorothy B. v. Berryhill*, 18 CV 50017, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (relying exclusively on Ninth and Sixth Circuit caselaw to find that 17,700 jobs was a significant number of jobs in the national economy); *Iversen v. Berryhill*, 16 CV 7337, 2017 WL 1848478, at *5 (N.D. Ill. May 8, 2017) (finding 1,000 local jobs and 30,000 jobs in the national economy was significant number of jobs, but primarily relying on and only citing to caselaw finding that 1,000 local jobs constituted a significant number).

not held continuously." *Hill v. Colvin*, 807 F.3d 862, 872 (7th Cir. 2015) (Concurrence, J. Posner) (joining in the majority opinion but writing separately to emphasize the "persistent, serious, and often ignored deficiency" of relying – without sufficient scrutiny – on improper or questionable VE testimony).[4]

Again, the Commissioner bore the step five burden of demonstrating that a significant numbers of jobs exist in the national economy and he was required to provide substantial evidence to meet that burden. *Milhem*, 52 F.4th at 696 ("Substantial evidence means evidence a reasonable person would accept as adequate to support the decision."). Relying on either the wrong job code or the wrong job does not meet that burden as to that job, particularly when the provided job code leads to a job that is only occasionally performed in the national economy in election years. *See Thomas D. v. Kijakazi*, 20 C 2683, 2023 WL 2561614, at *10 (N.D. Ill. Mar. 17, 2023) ("But rolling out the DOT with its lack of clarity about whether and how many jobs exist for Plaintiff as bench sorter – whatever that is – does not allow the Court to conclude that substantial evidence supports the result

---

[4] In *Liskowitz v. Astrue*, 559 F.3d 736, 745-46 (7th Cir. 2009), the Seventh Circuit held that part time positions may be reasonably considered and relied upon by an ALJ when properly identified by the VE. Here, however, the VE's testimony did not properly identify this position (Tr. 68). Moreover, the position of election clerk is not a year-round, part time position, but instead is a position that may only be needed for a short period of time in election years. Thus, given these two key distinctions, as well as Judge Posner's concurrence in *Hill*, the Court believes it is more than fair to at least require appropriate identification of an occasional position such as election clerk before it is included in the ALJ's step five determination.

Moreover, given this unique factual scenario, the Court is not persuaded by the Commissioner's argument that Plaintiff was required to raise this objection at the hearing (*see* Doc. 21 at p. 12). "We have repeatedly noted that if a vocational expert's testimony appears to conflict with the DOT, the ALJ must obtain a reasonable explanation for the apparent conflict, and that a claimant's failure to object during a hearing cannot excuse an ALJ's failure to do so." *See Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (internal quotation marks and citations omitted). Beyond the clear conflict between the VE's testimony and the DOT presented here, the Court questions whether it would be fair to expect a claimant to immediately know when a VE has misidentified a DOT position to then instantly raise an objection, or risk losing his or her ability to do so.

here."). Thus, the Court agrees with Plaintiff that those 6,000 positions must be excluded from the ALJ's step five determination as to whether a significant number of jobs exist in the national economy.

And significantly, irrespective of whether a reasonable person would accept the ALJ's determination that 28,000 jobs constitutes a significant number of jobs in the national economy, the ALJ's decision neither addresses nor provides substantial evidence to support the assertion that 22,000 jobs also constitutes a significant number of jobs in the national economy. Quite simply, the ALJ did not reach that question and therefore, the Court has no way of knowing whether the ALJ would or would not find that the lower figure constitutes a significant number of jobs (*see generally* Tr. 29).[5] Consequently, the Court concludes that the Commissioner has not met its burden at step five by demonstrating that a significant number of jobs exist in the national economy that Plaintiff can perform.

In addition, while the Court finds remand appropriate based upon the above determination, the Court will touch briefly on an additional concern it has regarding the occupations of document preparer and addressing clerk. Namely, the Court questions whether those positions are still viable jobs with the same exertional demands; or, in light of technological advances, are now either obsolete and/or containing different exertional

---

[5] When questioned by Plaintiff's counsel, the VE indicated that two other positions could be performed by an individual with Plaintiff's RFC (Tr. 70-71). Specifically, those positions are surveillance system monitor, with 3,000 jobs nationally, and charge account clerk, with 2,000 jobs nationally (Tr. 71).

Notably, although the ALJ did not mention those two jobs in his decision (*see* Tr. 28-29), even if the Court were to account for them, it would still raise the question of whether the lower figure of 27,000 jobs constitutes a significant number of jobs in the national economy. A question to which the burden falls squarely upon the Commissioner to demonstrate.

demands. *See Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014) ("No doubt many of the jobs [listed in the Dictionary of Occupational Titles] have changed and some have disappeared."). For example, in analyzing the position of document preparer, one court explained:

> That concern is particular relevant in this case, where one of the jobs described by the VE, that of document preparer, microfilming, is described as follows:
>
> Prepares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices: Cuts documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduces document pages as necessary to improve clarity or to reduce one or more pages into single page of standard microfilming size, using photocopying machine. Stamps standard symbols on pages or inserts instruction cards between pages of material to notify [microfilm camera operator] of special handling, such as manual repositioning, during microfilming. Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule.
>
> DOT 249.587-018. The job of preparing documents for microfilm preservation is one that seems particularly likely to have changed in the last 37 years given the shift to digital storage and advances in scanning technology.

*Dearth v. Berryhill*, No. 2:16-CV-487-JEM, 2018 WL 1225045, at *4 (N.D. Ind. Mar. 9, 2018). Similar concerns have been expressed by judges within this district. *See Penny P. v. Kijakazi*, No. 21-CV-1055-SPM, 2022 WL 1289355, at *5 (S.D. Ill. Apr. 29, 2022).

To be fair, the ALJ astutely recognized this concern and questioned the VE about the likely changes in these two positions since they were last updated in the DOT (Tr. 70). In fact, the ALJ even briefly acknowledged the changing nature of those positions in his

decision (Tr. 29). While such an acknowledgement and explanation may be sufficient to address the changes to those positions, the Court nonetheless points out its concern with relying upon the DOT's job classifications for those two indisputably outdated positions because the VE was never explicitly asked whether an individual with Plaintiff's RFC could perform those positions in light of their changes due to technological advancements. Beyond any potential changes to the physical demands of those evolving positions, the Court questions whether those positions still reflect unskilled work as they did when last updated in the DOT, or if they now reflect semi-skilled or skilled work thereby requiring findings as to Plaintiff's ability to perform those skills. *See, e.g.*, SSR 83-10 ("Ability to perform skilled or semiskilled work depends on the presence of acquired skills which may be transferred to such work from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semiskilled work.").[6] Likewise, because both the VE and the ALJ acknowledged that those positions have changed since they were last updated in the DOT, this raises the additional, obvious follow-up question of whether the total number of jobs in the national economy for those positions has also changed after their duties (and potentially, their necessity) evolved. Given those two positions constitute 20,000 jobs out of the 28,000 jobs in the national economy that the ALJ relied upon in his Decision,

---

[6] *See also Laronda T. v. Bisignano*, 25 C 6206, 2025 WL 3754467, at *3 (N.D. Ill. Dec. 29, 2025) ("Along those lines, the ALJ's decision offers no explanation for how Plaintiff could transition from performing unskilled work as a custodian to performing semi-skilled work as, for instance, a Data Examination Clerk."); 20 C.F.R. § 404.1520 ("If we find that you cannot do your past relevant work because you have a severe impairment(s) … we will consider the same residual functional capacity assessment … with your vocational factors (your age, education, and work experience) to determine if you can make an adjustment to other work.").

the Court believes it would be prudent to have clear VE testimony as to those questions if the Commissioner wishes to rely upon those positions to meet its step five burden.[7]

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled or that he should be awarded benefits. To the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

<u>CONCLUSION</u>

The Commissioner's final decision denying Plaintiff's application for DIB is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** March 31, 2026

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

---

[7] On remand, the Court also believes it would be beneficial for the ALJ and Plaintiff to further discuss Dr. Reddy and Dr. Chapa's findings that Plaintiff could sit for "*about 6 hours* in an 8 hour workday," which the ALJ presumably relied upon to determine that Plaintiff could sit for "*at least 6 out of 8 hours*" in a workday (Tr. 23, 88) (emphasis added). Specifically, those doctors found Plaintiff could stand for a total of exactly 2 hours and sit for about 6 hours (Tr. 88). Certainly, "about 6 hours" could mean exactly 6 hours or slightly more than 6 hours. However, it could also indicate that Plaintiff could sit for slightly less than 6 hours. This ambiguity is crucial because the Court does not see, and the ALJ did not cite to, any other medical opinion or medical record that indicated Plaintiff could sit for *at least* 6 hours in a workday. And notably, if Plaintiff could not sit for 6 hours or more, but instead for slightly less than 6 hours, then he could not work for an entire 8 hour workday given that he could only stand for 2 hours.